# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6807 | **DATE** | 8/24/2004 |
| **CASE TITLE** | Shree M. Agrawal vs. Kenneth R. Briley, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 9/7/2004 at 8:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. The court grants Plaintiff's motion for summary judgment (Doc. No. 40-1) as to the liability of both Peterson and Briley under RLUIPA. The court will convene a telephone status conference on Tuesday, September 7, 2004, and directs Defendants' counsel to make arrangements for Plaintiff to participate in such a call.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | 5 | **Document Number** |
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | AUG 25 2004 | |
| | Notified counsel by telephone. | | | date docketed | 11 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 8/24/2004 | |
| | | | | date mailed notice | |
| ETV | courtroom deputy's initials | | | ETV | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

SHREE M. AGRAWAL,                    )
                                     )
    Plaintiff,               )
                                     )   **No. 02 C 6807**
    v.                       )
                                     )   **Judge Rebecca R. Pallmeyer**
KENNETH R. BRILEY, et al.,           )
                                     )
    Defendants.              )

## MEMORANDUM OPINION AND ORDER

Plaintiff Shree M. Agrawal, a prisoner in the custody of the Illinois Department of Corrections (IDOC) at Menard Correctional Center, brought this *pro se* civil rights action under 42 U.S.C. § 1983 against IDOC officials, alleging that Defendants deprived him of rights guaranteed by the Constitution while he was confined at Stateville Correctional Center. Plaintiff claims that Defendants denied him his First Amendment right to practice his religion (Vaishnava Hindu) by refusing to provide him with a nutritious diet free of meat and eggs, even though a vegetarian diet conforming to Plaintiff's religious requirements was available to Stateville inmates who were members of the "Hebrew Israelite" faith. As a condition for obtaining a religiously acceptable diet, prison officials required Plaintiff to obtain a letter from his "church, mosque or clergy from a Hindu Temple" stating that he is a practicing Hindu and that a vegetarian diet is obligatory. Plaintiff alleged that no such verification was required of those claiming to be of the "Hebrew Israelite" faith.

In its initial review of the complaint pursuant to 28 U.S.C. § 1915A, the court found that Plaintiff had stated a claim under the First Amendment. *See Agrawal v. Briley,* No. 02 C 6807, 2003 WL 164225 (N.D. Ill. Jan. 22, 2003). Plaintiff's amended complaint filed April 7, 2003, added a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, based on the same facts. On November 25, 2003, the court denied Defendants' motion to dismiss this claim, *Agrawal,* 2003 WL 22839813, rejecting Defendants' challenges to the

sufficiency of Plaintiff's allegations and holding that Defendants were not entitled to qualified immunity.

When the court denied Defendants' motion to dismiss, it appeared that there was little if any disagreement concerning the core facts underlying Plaintiff's RLUIPA claim. Plaintiff filed a motion for summary judgment, albeit without any supporting affidavits or Local Rule 56.1(a) Statement. Nevertheless, because Plaintiff's amended complaint was signed under penalty of perjury, it can function as an affidavit under FED. R. CIV. P. 56(e), to the extent Plaintiff's statements are based on his personal knowledge. *Ford v. Wilson*, 90 F.3d 245, 247 (7th Cir. 1996). The court directed Defendants to treat Plaintiff's citations to the amended complaint on the second page of his motion as his statement of undisputed material facts. Defendants responded on March 12, 2004, presenting their version of the facts in two statements, in accordance with Local Rule 56.1(b)(3).[1] Plaintiff's motion for judgment in his favor under RLUIPA is now before the court.

## DISCUSSION

### I.     Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Outlaw v. Newkirk*, 259 F.3d 833, 836 (7th Cir. 2001). The court is not required to draw every conceivable inference from the record;

---

[1]     The first statement, captioned "Local Rule 56.1(b)(3)(A) Filing," responding to statements in the amended complaint, we will refer to as "Defendants' Statement of Facts," or "DSF." The second, captioned "Local Rule 56.1(b)(3)(B)," we refer to as "Defendants' Statement of Additional Facts," or "DSAF." The third portion of the response, defendants' memorandum of law, is cited as "Def. Mem."

"mere speculation or conjecture" will not defeat a summary judgment motion. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003). Further, only a dispute concerning a *material* fact, one that might affect the outcome of the suit under the applicable law, precludes the entry of summary judgment. *Anderson*, 477 U.S. at 248; *Outlaw*, 259 F.3d at 837, 840-41.

The RLUIPA was enacted by Congress in response to the Supreme Court's decision in *City of Boerne v. Flores,* 521 U.S. 507 (1997), striking down the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb-bb4, insofar as it applied to state and local governments. RFRA, in turn, had represented Congress's attempt to undo the Supreme Court's holding in *Employment Division v. Smith,* 494 U.S. 872 (1990), that laws of general applicability can be enforced against religiously-motivated conduct without infringing the free exercise clause of the First Amendment. The portion of RLUIPA relevant here provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in [42 U.S.C. § 1997], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
>
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). RLUIPA defines "government" as broadly as possible, including not only state, county and municipal governments and agencies, but officials of such entities and "any other person acting under color of State law." 42 U.S.C. § 2000cc-5(4). RLUIPA's provisions relating to institutionalized persons apply only to "program[s] or activit[ies]" receiving federal financial assistance, 42 U.S.C. § 2000cc-1(b). The Seventh Circuit has held that § 2000cc is a valid exercise of Congress's power under the Constitution's Spending Clause. *Charles v. Verhagen,* 348 F.3d 601, 610 (7th Cir. 2003).[2]

For purposes of Defendants' motion, RLUIPA requires Plaintiff to show that there is no

---

[2]     Defendants do not deny that IDOC receives federal funds and is subject to RLUIPA.

3

genuine dispute that Defendants imposed a "substantial burden" on the exercise of his religion. Once he has done so, Defendants can defeat summary judgment by presenting evidence, that, if believed, would justify a determination that the imposition furthered a compelling governmental interest, and that it was the least restrictive means of doing so.

## II. Analysis of Plaintiff's Claim Under RLUIPA

### A. Plaintiff's Diet

Plaintiff is a Vaishnava Hindu, whose sincerely-held religious beliefs require a "lacto-vegetarian" diet, i.e., abstention from foods derived from animal sources other than dairy products. Defendants assert that these matters are disputed, but the evidence they cite does not, in this court's view, create a genuine dispute of fact. First, Defendants note that Plaintiff asserts that his religion requires him to be "pure vegetarian," which Defendants equate with "vegan," i.e., consisting only of vegetable products, yet Plaintiff admits eating dairy products. DSF ¶¶ A-3, A-4. This purported inconsistency is not relevant to the issue here. Plaintiff has clearly and consistently stated what his religion permits and forbids; whether that corresponds to what Defendants call a "vegan" diet is not material.

Next, Defendants point to Plaintiff's statement in the amended complaint that on occasion, he ate eggs or food containing eggs. This, Defendants assert, shows either that (a) contrary to Plaintiff's assertion, Vaishnava Hinduism permits Plaintiff to eat eggs, DSF ¶ A-6, or (b) that Plaintiff does not sincerely follow the dietary rules of Vaishnava Hinduism, DSF ¶ A-7. The statement to which Defendants refer, however, is Plaintiff's assertion that he "did not eat food which was in violation of the dietary rules of his religious faith except in rare occasions when he was unable to tolerate hunger then only few times he ate some food which may have egg." Amd. Cmplt. ¶ E-6. This statement does not establish any genuine dispute as to the requirements of

Vaishnava Hinduism or Plaintiff's sincerity.[3]

In response to Plaintiff's assertion that he does not eat vegetarian food contaminated by non-vegetarian food, Defendants assert that "as there are many different Hindu sects, all with their own dietary suggestions and requirements, Defendants do not concede that the vegetarian diet of the type claimed by plaintiff to be required by his religion is required or necessary under RLUIPA." DSF ¶ A-8. Defendants cite no evidence in the record concerning the dietary requirements of other Hindu sects to support this assertion. In any event, Plaintiff claims that Defendants impermissibly burdened *his* religious practice; he is not suing on behalf of Hindu prisoners generally.

Indeed, Defendants' arguments appear to assume that the First Amendment and RLUIPA protect the rights of religious groups. On the contrary, both protect the *individual*'s religious practice from government interference, regardless of the individual's membership in any particular religious *group*. RLUIPA addresses the imposition of "a substantial burden on the religious exercise of a *person*," not a member of a religious group, and Congress enacted RLUIPA in the context of Supreme Court decisions holding that the First Amendment's Free Exercise Clause protects an individual's right to follow his or her sincerely held religious belief. The protection is in force even if the plaintiff's belief is not held by all adherents of a religious group, *Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707 (1981), and even if it is purely personal. *Frazee v. Illinois Dept. of Employment Security,* 489 U.S. 829 (1989).

In *Frazee,* petitioner was denied unemployment benefits because he refused to accept employment requiring him to work on Sundays, which he asserted would violate his personal Christian faith. Respondent took the position that to be entitled to First Amendment protection,

---

[3]     Similarly, Defendants' assertion that "Plaintiff was recently removed from the religious diet at Menard Correctional Center as he purchased food products containing animal by-products (cheese) which some Hindi [sic] claim to be counter to their religious diet needs," DSF ¶ A-7, creates no genuine dispute as to the sincerity of Plaintiff's religious beliefs, because he has never asserted that cheese is forbidden to him.

petitioner's refusal "must be based upon some tenets or dogma . . . of some church, sect, or denomination, and such a refusal based solely on an individual's personal belief is personal and noncompelling and does not render the work unsuitable." *Frazee*, 489 U.S. at 830. The Supreme Court unanimously rejected that view of the First Amendment:

> Frazee asserted that he was a Christian, but did not claim to be a member of a particular Christian sect. It is also true that there are assorted Christian denominations that do not profess to be compelled by their religion to refuse Sunday work, but this does not diminish Frazee's protection flowing from the Free Exercise Clause. *Thomas* [*v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707 (1981)] settled that much. Undoubtedly, membership in an organized religious denomination, especially one with a specific tenet forbidding members to work on Sunday, would simplify the problem of identifying sincerely held religious beliefs, but we reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization. Here, Frazee's refusal was based on a sincerely held religious belief. Under our cases, he was entitled to invoke First Amendment protection.

*Id.* at 834 (footnote omitted).

There is no reason to suppose that Congress intended the scope of protection granted to inmates' religious practices under RLUIPA to be narrower than it had been under pre-*Smith* First Amendment law. The court concludes that Plaintiff's rights under RLUIPA flow from his sincerely-held religious beliefs, not the label of Vaishnava Hinduism. The religious practices of other Hindus, and whether RLUIPA would be violated by IDOC's or Stateville's policies if applied to them, are simply irrelevant here.

### B. Burden

Plaintiff asserts that Defendants' denying him a vegetarian or lacto-vegetarian diet and only offering Plaintiff the standard prison diet imposed a substantial burden. Defendants challenge this assertion, arguing that "Plaintiff has produced no documentary evidence that he was ever categorically denied a religious diet," and has instead submitted only "self-serving allegations." Def. Mem. 7. The court notes first, however, that Plaintiff need not establish that Defendants "categorically" denied him a vegetarian diet. Instead, Plaintiff asserts, and Defendants have not

disputed, that his receipt of a vegetarian diet was contingent on his compliance with the condition that he obtain documentation from a "faith leader" of his need for such a diet. Defendants' objection to the evidence Plaintiff offers as "self-serving" is overruled. Indeed, the very case they cite, *Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) rejects the argument that a plaintiff's deposition testimony should be disregarded because it is self-serving:

> We hope this discussion lays to rest the misconception that evidence presented in a "self-serving" affidavit is never sufficient to thwart a summary judgment motion. Provided that the evidence meets the usual requirements for evidence presented on summary judgment--including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial--a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts.

*Id.* at 773. Not only may "self-serving" affidavits be offered to defeat a summary judgment motion; admissible evidence contained in the moving party's "self-serving" affidavit, if unrebutted, can support a grant of summary judgment. *See, e.g., Dominguez v. Alliance Mortgage Co. of Chicago*, 226 F.Supp.2d 907, 914 (N.D. Ill. 2002) (Moran, J.).

Plaintiff asked Defendants for a vegetarian diet on religious grounds, a vegetarian diet was available, it was in Defendants' power to give it to him, and he did not receive it. These facts were within Plaintiff's personal knowledge and Defendants do not dispute them. With respect to the issue of burden, Defendants admit that the diet at Stateville did not meet Plaintiff's asserted religious requirements. They dispute his assertion that Stateville prisoners received food providing 2,000 calories daily, but whether prisoners were served foods providing 2,000 or 3,000 calories daily, Defendants do not dispute that more than half the calories were provided by food Plaintiff was religiously forbidden to eat. DSF ¶¶ E-1, E-2.

Prisoners are entitled to receive nutritionally adequate food, *French v. Owens,* 777 F.2d 1250, 1255 (7th Cir. 1985), and adequate nutrition requires more than calories. Defendants argue that "[Plaintiff] could have picked the foods from the line or on his delivered food tray which were consistent with the vegetarian diet he is claiming he requires," Def. Mem. at 5, citing to the affidavit

7

of Quentin Tanner, Dietary Manager at Stateville, Def. Ex. G. Nothing in Tanner's affidavit suggests, however, that Stateville prisoners' regular fare would have provided adequate nutrition if meat and eggs were omitted.[4] Defendants do not dispute that Stateville provided a nutritious vegan diet to inmates professing the "Hebrew Israelite" faith. DSF ¶ D-7. Nevertheless, although this diet was available and would have complied with Plaintiff's religious restrictions, and Plaintiff asked for it, he was not permitted to receive it.

Defendants argue that Plaintiff himself "burdened" his religious practice by failing to comply with established procedures for obtaining a religiously acceptable diet. Plaintiff asserts that prisoners professing to be "Hebrew Israelites" were given a vegan diet without providing the written verification he was required to submit. For purposes of this motion, that statement is controverted by Defendant Peterson's affidavit, stating that the rule was applied equally to prisoners of all faiths. Peterson Aff., Def. Ex. F-1 at ¶ 4. In Defendants' view, the requirement that prisoners furnish a written verification from clergy concerning their religious practice may be a burden, but it is not a substantial one. According to Defendants, the Seventh Circuit has held that a substantial burden is one that "necessarily bears direct, primary and fundamental responsibility for rendering religious exercise . . . effectively impracticable." Def. Mem. at 6. The case they cite, however, *Rogers v. Hellenbrand*, No. 03-C-230-C, 2004 WL 433976 (W.D. Wis. Mar. 4, 2004), is a district court opinion. The Seventh Circuit case that it relies upon utilizes this definition for a "land use regulation that imposes a substantial burden on religious exercise," not a prison regulation. *See Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 761 (7th Cir. 2003).

Defendants also cite *Resnick v. Adams,* 348 F.3d 753 (9th Cir. 2003), where plaintiff, an

---

[4]     The court notes that Tanner's affidavit does not technically comply with the requirements of Rule 56(e), as it was not signed by a notary and, although he asserts he was "duly sworn upon oath," he does not state that his declaration is made under penalties of perjury. *See* 28 U.S.C. § 1746. More significantly, Tanner states that he has worked at Stateville since August 2002; there is no indication he has personal knowledge of the food offered to Plaintiff before his transfer from Stateville on January 22, 2002. DSF ¶ A-1.

Orthodox Jew, sought a kosher meal but failed to complete and submit the standard prison form application for such a diet. This court agrees with the Ninth Circuit that no substantial burden is imposed by a requirement that a prisoner provide a writing in which he declares his religious beliefs, describes the dietary accommodation he requests, and explains why his beliefs require that accommodation. Here, however, Defendants require more than this: Plaintiff was required to obtain proof from a clergy person that Plaintiff was, in fact, a Vaishnava Hindu, and that Vaishnava Hinduism requires the diet Plaintiff requested.

IDOC regulations give the institutional chaplain, here Defendant Peterson, responsibility for determining whether a prisoner may receive a special diet for religious reasons:

> A committed person may submit a written request to the facility chaplain to receive an alternative diet for specific religious reasons. The request must contain written verification that the committed person is a member of a faith group that requires adherence to a particular diet and the specific requirements of the diet. Eligibility to receive an alternative diet for specific religious reasons shall be determined by the facility chaplain who shall ordinarily confer with a religious leader or faith representative of the faith group at issue. The facility chaplain and the religious leader or faith representative may interview the committed person.

20 Ill. Admin. Code § 425.70. As the court noted in its initial review of the complaint, the regulation does not on its face appear to require that a clergy person provide the required "written verification." The court presumes that a committed person could himself furnish written verification of his religious affiliation and his need for a particular diet. Nevertheless, it is undisputed here that it was (and is) Defendant Peterson's understanding that verification by a clergy member is required:

> According to Rule 425.70, in order to receive a religious diet, inmates must obtain a letter from a faith representative which states that they are a member or practitioner of the faith, and that the religion requires adherence to a particular diet and the specific requirements of the diet. It is the inmate's responsibility to obtain this letter, according to the rule.

Peterson Aff., Def. Ex. F, at ¶ 3.

In this court's view, this procedure is inconsistent with the First Amendment as interpreted by the Supreme Court in *Frazee*. It impermissibly makes a prisoner's receiving a diet consistent

with the prisoner's religious beliefs contingent upon his beliefs being consistent with those professed by some recognized religious group. *See Ford v. McGinnis*, 352 F.3d 582 (2d Cir. 2003) (Muslim prisoner could assert religious right to participate in postponed Eid-ul-Fitr feast, even though Muslim religious authorities held that postponement deprived feast of religious significance). It also impermissibly requires that the prisoner be recognized as a member by that group's clergy. *See Jackson v. Mann,* 196 F.3d 316, 320-21 (2d Cir. 1999) (under First Amendment, prisoner's sincere belief that he is a Jew entitled him to kosher diet, even though a rabbi determined he was not Jewish under Jewish law).

Even apart from any First Amendment concerns, the court concludes that as interpreted by Defendants, the regulation imposed a substantial burden on Plaintiff. Defendants' argument that Plaintiff could readily comply with the requirement that he obtain documentation from a faith leader assumes (a) that Vaishnava Hinduism is a religion or denomination in the Western sense, such that there are accepted criteria for determining who is and is not a member; (b) that Vaishnava has clergy in the Western sense, i.e., religious leaders whose authority in religious matters is recognized and accepted within the religious group; and (c) that a Vaishnava clergy person was available, willing and able to confirm to Defendants, if asked, that Plaintiff was a Vaishnava Hindu and was required to abstain from foods containing meat or eggs or contaminated by them.

Although these assumptions may be true, no evidence in the record supports them. Peterson states that, had Plaintiff asked, he would have assisted Plaintiff by looking through the phone book or online for a Hindu temple "so that [Plaintiff] could seek an acceptable volunteer to verify his dietary needs." Ex. F ¶ 7. Peterson does not state that he offered this assistance, and apparently does not know to this day whether "an acceptable volunteer" was available.[5] But verifying Vaishnava Hinduism's dietary requirements was only half of the matter; Peterson's

---

[5]     There is no evidence concerning Chaplain Peterson's knowledge of Hinduism, or what criteria he would apply to determine whether a "volunteer" was "acceptable."

affidavit bypasses the question of whether, and how, "an acceptable volunteer" would "verify" that Plaintiff was a Vaishnava Hindu.

The IDOC regulation requires verification that the prisoner is a *member* of a faith group, but Chaplain Peterson asserts that he would only require that Plaintiff prove that he is a member or *practitioner* of the faith.[6] Because Plaintiff has the burden of proof on the issue of whether verification imposed a "substantial burden," we assume that only verification of Plaintiff's religious practices by a member of the clergy of his faith was required. Nevertheless, since Peterson implicitly acknowledges that Plaintiff did not know a clergy person personally who could vouch for his religious identity, Peterson expected Plaintiff to locate a clergy member willing to drive to Stateville, interview a stranger regarding his religious beliefs and practices, and write a letter to Chaplain Peterson on his behalf, without compensation and with no legal obligation to do so. Only "mere speculation or conjecture," *McCoy*, 341 F.3d at 604, would permit the court to find this to be less than a substantial burden.

### C.    Defendants' Justification

Under the First Amendment, a prison regulation that limits an inmate's First Amendment rights must only be "reasonably related" to legitimate penal interests. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349-52 (1987); *Turner v. Safley*, 482 U.S. 78, 89 (1987). Under RLUIPA, however, Defendants face a far heavier burden of persuasion, as they must show that the rule is the "least restrictive means" of furthering a "compelling governmental interest." These terms have their historical roots in pre-*Smith* Supreme Court opinions addressing state laws burdening or penalizing religiously-motivated conduct. In *Sherbert v. Verner*, 374 U.S. 398 (1963), the Court held that

---

[6]    This is an important distinction. For some religions, identifying with the religion and choosing to practice its rituals suffices to make one a "member," but for others there are objective ritual prerequisites; for example, some forms of Christianity require baptism. Consequently, verifying that a person practices a faith can be much easier than verifying his or her membership in a religious group.

South Carolina could not deny unemployment benefits to a Seventh-Day Adventist who refused to work on Saturday:

> We must next consider whether some compelling state interest . . . justifies the substantial infringement of appellant's First Amendment right. It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, '(o)nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation,' *Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430. No such abuse or danger has been advanced in the present case. The appellees suggest no more than a possibility that the filing of fraudulent claims by unscrupulous claimants feigning religious objections to Saturday work might not only dilute the unemployment compensation fund but also hinder the scheduling by employers of necessary Saturday work . . . . [E]ven if the possibility of spurious claims did threaten to dilute the fund and disrupt the scheduling of work, it would plainly be incumbent upon the appellees to demonstrate that no alternative forms of regulation would combat such abuses without infringing First Amendment rights.

*Id.* at 406-407. In 1972, the Court held that Wisconsin could not compel Amish parents to send their children to school beyond the eighth grade, stating, "The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). In *Thomas v. Review Bd., supra*, 450 U.S. at 708, the Court articulated the test in substantially the form adopted by RLUIPA: "The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest."

The court concludes that Defendants' asserted justifications fall short of meeting this burden. It is undeniable that, in the abstract, safety, security, internal order and discipline, and the management and conservation of resources are "compelling interests." It does not follow, however, that anything that furthers one or more of these interests, however marginally, is equally "compelling." Wisconsin undeniably had a compelling interest in educating its citizens, but the Supreme Court in *Yoder* held that once Amish children had acquired the basic knowledge and skills conveyed by an eighth-grade education, the state's interest must yield to their parents' right to raise them in their faith. Likewise, while Illinois undeniably has a compelling interest in conserving its

economic resources, the possibility that Plaintiff's preferred diet cost a small amount more per year could not be considered compelling.

Warden Briley explains the purpose of Rule 425.70 as follows:

> The reason for [Rule 425.70] is to assist in the management of the Dietary Department, as there is the potential for a special diet request from any of the inmates practicing the various religions and the only way to manage the cost of providing the foods necessary, as well as managing the amounts of food necessary for those with special religious needs necessitates having a system in place to monitor dietary needs and supplies.

> There is a valid penological interest in having a rule requiring inmates to submit a request for a religious diet to protect economic resources and to prevent inmate manipulation of the system. There is also a valid security interest in controlling inmate access to a vegetarian diet as if the prison were required to keep large quantities of fruits, vegetables and grains on hand, along with problems of cost and difficulty in storage, there is a potential for problems with security from the prisoners, including Plaintiff fermenting the fruit into alcohol.

Briley Aff., Def. Ex. D, ¶¶ 22-23. Quentin Tanner, Stateville's dietary manager, explains that prisoners receiving vegan meals go through a separate food line, and may supplement their meals by requesting extra servings of fruits, vegetables and starches, which the court infers are not offered to prisoners receiving the standard diet. Tanner Aff., Def. Ex. G, ¶ 9. Vegan meals are more costly and more perishable than regular meals. *Id.* ¶ 7. According to Tanner, unless the dietary department knows how many prisoners are receiving a vegan diet, the proper number of vegan meals will not be prepared and food will be wasted. *Id.* ¶ 11. Tanner also states that fruits and vegetables "can [be] and are" used to make alcohol. *Id.* Tanner explains that Stateville offers a vegan diet for all prisoners who cannot eat meat for religious reasons; it would add extra expense to create additional alternatives for prisoners who may eat dairy products and for prisoners who may eat dairy products and eggs. *Id.* ¶ 12.

The court is uncertain that any of the interests Defendants identify--the additional cost of vegan diets for inmates requesting them without a bona fide religious justification, the cost of wasted food when inmates may select vegan or standard meals at will, unspecified storage

problems, and the possibility that giving more inmates access to extra fruits and vegetables will increase the amount of illicit alcohol produced at Stateville–are "compelling" interests for purposes of RLUIPA. Even assuming that they are compelling interests, Defendants make no showing whatever that Rule 425.70 is the least restrictive means of dealing with these concerns.[7]

Defendants take the position that "it seems difficult to imagine any regulation less restrictive. The only alternative less restrictive would be to allow inmates to self report their religious preferences and dietary needs, which would be the equivalent of no regulation at all." Def. Mem. at 9. On the contrary, a regulation that (perhaps like the one in *Resnick, supra*) does not require written verification by a clergy member would be less restrictive and would hardly be "the equivalent of no regulation at all." Religious beliefs are necessarily subjective and "self-reported." Because the state is required to accommodate only sincerely-held religious beliefs, prison regulations may require a prisoner requesting a special diet for religious reasons to provide a verified statement, i.e., made under penalty of perjury, concerning the religious beliefs upon which he bases his request, and an acknowledgment that conduct inconsistent with these beliefs may result in the denial or revocation of the dietary accommodation. Such a regulation would impose no significant burden on prisoners' free exercise of religion, yet would satisfy most, if not all, of Defendants' concerns. Prisoners' statements on file would tell administrators how many prisoners are to receive a particular diet, so that the appropriate quantities of supplies may be ordered and the appropriate number of servings prepared. Administrators would know who was receiving a vegan diet, and their cells could be checked for hoarded fruit. If there are separate food lines for inmates approved

---

[7]    The court recognizes that Defendant Peterson has asserted that "Rule 425's requirement of written verification of the inmates' religious affiliation and special dietary requirements is the least restrictive means to achieve the government interest in managing the dietary, economic and security needs of the institution." Peterson Aff., Def. Ex. F-1, ¶ 9. That statement is insufficient to defeat summary judgment, in the court's view, because it states a legal conclusion and does not appear to be based on Chaplain Peterson's personal knowledge; there is no evidence that the dietary, economic, or security needs of the institution are Chaplain Peterson's responsibility.

for special diets, as at Stateville, or separate servings are prepared for them, access to specially-prepared food can easily be limited to those prisoners authorized to receive it.

Eliminating the clergy-verification requirement wo uld presumably make it easier for prisoners to obtain the more costly vegan diet.[8] Defendants have offered no evidence, however, of the number of additional prisoners who would be expected to ask for a vegan diet but who are not entitled to it on the basis of sincere religious belief. Indeed, there is no evidence to support the notion that such a diet would be so desirable that prison authorities could expect prisoners to falsely claim a religious need for it. Unsupported by such evidence, Defendants' bare assertion that accommodating prisoners' religious practice would impose unquantified costs and administrative burdens cannot defeat Plaintiff's claim under RLUIPA. The court accordingly finds that Defendants have not met their burden of coming forward with evidence showing that Rule 425.70 is the least restrictive means of furthering a compelling governmental interest.

## III. Defendant Briley's Personal Liability

Briley asserts that he cannot be liable for any violation of Plaintiff's rights because he was not personally involved in the decision to deny Plaintiff a vegetarian diet. Having delegated the task of reviewing inmate grievances to subordinates, Briley was unaware of this dispute prior to Plaintiff's filing of this lawsuit. Briley Aff. ¶ 17. In seeking dismissal of the claim against him on this basis, Briley relies on the well-established rule that supervisors are not automatically liable under § 1983 for subordinates' constitutional torts: "supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Morfin v. City of East*

---

[8]     Defendants assert that it would impose additional costs to provide a lacto-vegetarian diet in addition to a vegan diet. In the court's view, this concern is not relevant: Plaintiff has never demanded a lacto-vegetarian diet; although Plaintiff's religion permits dairy products, a vegan diet meets his religious requirements. Because Plaintiff's religion does not require him to consume dairy products, requiring him to abstain from them as a condition of receiving a vegan diet does not burden the exercise of his religion.

*Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003) (*quoting Jones v. City of Chicago,* 856 F.2d 985, 992-93 (7th Cir. 1988) (citations omitted).

The court notes, preliminarily, that this argument assumes that supervisory liability under RLUIPA is governed by the same standards as apply to claims brought under 42 U.S.C. § 1983. A claim brought under that section to enforce Plaintiff's First Amendment rights would indeed be governed by the "reckless indifference" standard. Here, however, Plaintiff seeks summary judgment only on his RLUIPA claim, not his First Amendment claim.

### A.    Liability under 42 U.S.C. § 1983

Before addressing the standards for establishing Briley's liability for violations of Plaintiff's rights under RLUIPA, the court notes that it is not certain that Briley could escape liability even under § 1983. In considering this issue, the court begins with IDOC's administrative grievance procedure, which requires the warden to be the final decisionmaker with respect to a grievance such as the ones filed by Plaintiff on this issue: Under the relevant regulations, a prisoner is initially required to attempt to resolve his problem informally through his assigned correctional counselor. If the problem is not resolved, the prisoner is expected to submit a written grievance on a prescribed form. 20 Ill. Admin. Code § 504.810(a). If the prisoner claims his grievance is an emergency, the grievance is routed directly to the Chief Administrative Officer, i.e., the warden of the institution, who is required to determine whether the grievance is to be handled on an emergency basis or returned for refiling as a routine grievance. *Id.*, § 504.840. Otherwise, the grievance is reviewed by one of the institution's designated grievance officers, who then submits written findings and recommendations to the warden. *Id.*, § 504.830(b). After reviewing the grievance officer's findings, the warden notifies the prisoner of the disposition of the grievance. *Id.*, § 504.830(d). As the IDOC grievance form reflects, the warden does so by checking one of three boxes, labeled "I concur," "I do not concur," or "Remand," a box which is followed by a space for

comments. Although Defendants here are correct that IDOC regulations do not require the warden to investigate most grievances personally, he or she is expected to monitor the process and take corrective action when appropriate.

As Briley explains in his affidavit, however, he delegated review of all non-emergency grievances as well as any grievance "regarding religious services and religious diets" to a subordinate, the Assistant Warden of Programs. Briley directed the Assistant Warden of Programs to review such grievances, prepare a response, and to sign Briley's own name to the response. Briley Aff., Def. Ex. D, ¶¶ 13-14.) Briley insists that his delegating all review of inmate grievances to subordinates is contemplated and permitted by IDOC regulations, but the court is less certain, for two reasons. First, the relevant regulation does not appear to contemplate that the warden will delegate the function of reviewing grievances as a routine matter:

504.805 Responsibilities

  (a) Unless otherwise specified, the Director or Chief Administrative Officer may delegate responsibilities stated in this Subpart to another person or persons or designate another person or persons to perform the duties specified.

  (b) No other individual may routinely perform duties whenever a Section in this Subpart specifically states the Director or Chief Administrative Officer shall personally perform the duties. However, the Director or Chief Administrative Officer may designate another person or persons to perform the duties during periods of his or her temporary absence or in an emergency.

20 Ill. Admin. Code § 504.805. Briley's delegation as a matter of standard procedure is inconsistent with subsection (b), because the duty to review grievances is expressly committed to the Chief Administrative Officer by § 504.830(d).

Second, Briley's procedures go well beyond what is normally understood by delegation. In any large organization, executives delegate authority to subordinates, including authority to make discretionary decisions. The subordinate is nevertheless accountable to the supervisor, and both the subordinate and those dealing with him or her are aware of this. Here, in contrast, Briley directed his subordinates to sign Briley's own name to the disposition of Plaintiff's grievance,

17

apparently with no further review or oversight by Briley himself, nor any notice to Plaintiff of the identify of the actual decisionmaker. Briley Aff. ¶ 20.

The Constitution does not guarantee that state officials will faithfully perform their duties under state law; Briley's failure to do his job does not by itself give Plaintiff a claim under § 1983. *Allison v. Snyder*, 332 F.3d 1076, 1078-79 (7th Cir. 2003). Nevertheless, Briley's official responsibilities under IDOC regulations are not irrelevant to his potential liability. But for Briley's procedures, IDOC's regulations would have channeled inmates' grievances across his desk. Because of the warden's duty to review the disposition of grievances, a prison grievance is more than an *ad hoc* communication to a high official with the power to act, *compare Crowder v. Lash*, 687 F.2d 996, 1006 (7th Cir. 1982). Nor is a warden's role in the grievance procedure merely perfunctory or formal, comparable to that of the former head of Illinois' Department of Children and Family Services discussed in *Volk v. Coler*, 638 F.Supp. 1540, 1549 (C.D. Ill. 1986) (Will, J.), *aff'd*, 845 F.2d 1422 (7th Cir. 1988).[9]

Briley cites *Johnson v. Lane*, 596 F.Supp. 408, 409 (N.D. Ill. 1984) (Bua, J.), where the court held that the warden of Stateville was not liable for his subordinates' decision to prohibit an inmate's wife from visiting him merely because the warden "was apprised of the matter but failed to intervene." In that case, however, the court's language suggested (as may at that time have been the case) that the warden played no role in the grievance procedure: "Nothing in the

---

[9] In *Volk*, the district court concluded that the Director of DCFS, who had general knowledge of plaintiff's employment complaints but delegated investigation of those complaints to a labor relations staff, was not liable for sex discrimination against plaintiff: "Director Coler's only participation in the entire grievance process was to assure the establishment of a structural review process and to approve the final decisions of the grievance committee. In almost every organization, these kinds of decisions eventually require final approval by the head of the organization; such events, however, cannot alone form the basis for § 1983 liability." 638 F. Supp. at 1549. The Seventh Circuit affirmed, but found the former Director's actions "very close to the line at which liability attaches," and cautioned, "We do not suggest that any employee in a supervisory capacity equal to [Coler's] . . . is, by virtue of that capacity, necessarily removed from liability for acts similar to those which occurred here." *Volk v. Coler*, 845 F.2d 1422, 1432 (7th Cir. 1988).

complaint or exhibits suggests that [Warden] DeRobertis' position in the prison hierarchy imposed upon him a duty to intervene." *Id.* Whether or not a warden's "position in the prison hierarchy," i.e., his or her supervisory authority, imposes a duty to act upon becoming aware of a constitutional violation, it is clear here that IDOC's regulations direct that the warden will both be aware and have the opportunity to act.

In two unreported decisions, Judge Manning of this court balanced the necessity for delegation against the basic principle that an official may not ignore a constitutional violation by deliberately shielding himself from knowledge. In *Powell v. Godinez*, No. 93 C 3469, 1997 WL 603927 (N.D. Ill. Sept. 24, 1997), the court granted summary judgment for Stateville's warden, who had referred plaintiff's complaint that he had been denied warm clothing to the assistant warden, another named defendant, observing:

> The warden of a large institution should be permitted to delegate authority to deal with prisoner complaints. By putting the warden's name on a letter or grievance, an inmate should not expect to hold the warden liable as a matter of course if the grievance is not resolved. On the other hand, if the warden's subordinates fail to resolve a problem and the prisoner again complains, the warden cannot insulate himself from responsibility by continuing to pass the problem to a subordinate he has reason to know is ignoring it. That would amount to "turning a blind eye." *And if the warden simply has a policy of not reading complaints from prisoners, it could be considered intentional ignorance, which can carry the same consequence as actual knowledge.* "Going out of your way to avoid acquiring unwelcome knowledge is a species of intent. Being an ostrich involves a level of knowledge sufficient conviction of crimes requiring specific intent. Because it is sufficient for criminal liability it is sufficient for liability under the eighth amendment's subjective standard." *McGill v. Duckworth*, 944 F.2d 344, 351 (7th Cir. 1991) (citations omitted).

*Id.* at *5 (emphasis added). In *Felton v. Godinez*, No. 93 C 4584, 1997 WL 610050 (N.D. Ill. Sept. 26, 1997), the court granted summary judgment where plaintiff showed no legally cognizable injury had resulted from defendants' alleged indifference to his needs. There, as here, Stateville's warden sought summary judgment on grounds that he routinely delegated authority for reviewing certain reports to his subordinates, but the court was unimpressed with that "defense":

> If such a bare declaration of policy defeats [plaintiff]'s claim, it would mean that a warden can virtually insulate himself from personal liability by arranging it so that

inmate complaints are always routed to someone else. It is also disturbing that [plaintiff] and the court are not told who was responsible.

*Id.* at *2.

If a warden ordered that all inmate grievances be ignored and discarded, there is little doubt such deliberate indifference would suffice for liability under § 1983. *Cf. Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993) ("If [Chicago police superintendent] Brzeczek had thrown the complaints into his wastepaper basket or had told the office of investigations to pay no attention to them, an inference would arise that he wanted the practice of physically abusing cop killers to continue"). Here, in contrast, Briley directed that grievances and complaints be forwarded to subordinates, not the trash bin, and Plaintiff has offered no evidence that Briley knew or suspected that his subordinates were not responding appropriately--or, as in Plaintiff's case, not responding at all--to inmates' grievances. Briley's practice of not only delegating his grievance review responsibilities, but of effectively masking this process by directing his subordinates to sign his own name, has little to commend it. Nevertheless, because there is no evidence that Briley knew or should have known that the process permitted a violating of Plaintiff's rights, the court would not conclude on this record that there are no disputes of fact concerning his liability. For this reason, the court concludes that Plaintiff has not established that he is entitled to judgment in his favor under the "reckless indifference" standard necessary to establish supervisory liability under 42 U.S.C. § 1983.

### B.    Liability under RLUIPA

As noted, Defendants' motion for summary judgment assumes that Briley's liability under RLUIPA parallels his liability under § 1983 for a corresponding First Amendment violation. For the reasons stated here, the court disagrees.

Section 1983, originally § 1 of the Civil Rights Act of 1871, creates a cause of action against "[e]very person who . . . subjects or causes to be subjected" another person "to the deprivation of

any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The Supreme Court held in *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978), that although a municipality is a "person" subject to suit under § 1983 (overruling *Monroe v. Pape*, 365 U.S. 167 (1961)), a municipality cannot be liable *"solely* because it employs a tortfeasor--or, in other words, . . . on a *respondeat superior* theory." *Id.* at 691. The Court based this conclusion on the statutory language "subjects or causes to be subjected": "[T]he fact that Congress did specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent." *Id.* at 692. This requirement of a causal relationship between the plaintiff's injury and some act or omission by the defendant not only bars vicarious liability based on employment, i.e., *respondeat superior*, but also vicarious liability based on a supervisory relationship.

In contrast to § 1983, which provides a cause of action against "any person," RLUIPA is violated when a "government" "impose[s] a substantial burden on the religious exercise of a person." Only a "government" may be sued under RLUIPA, but RLUIPA defines "government" broadly, as including not only state and local governments, but also their agencies, their officials, and others acting under color of state law. 42 U.S.C. § 2000cc-5(4). The definition applies both to those capable of "impos[ing] a substantial burden," § 2000cc-1, and those who may be sued for "appropriate relief" under § 2000cc-2. In speaking of liable parties as "governments" rather than "persons," RLUIPA appears implicitly to authorize *respondeat superior* liability against municipalities, and, if a state's acceptance of federal funds for its correctional system effects a waiver of Eleventh Amendment immunity, against states as well.

The court here considers whether Briley may be liable either because he was Peterson's supervisor, or because of the role IDOC's regulations gave him in the institutional grievance procedure. By its terms, RLUIPA does not preclude an award of relief against a supervisory official based upon a subordinate's actions, unless such relief is not "appropriate." Briley is correct that

21

Congress legislated in the context of First Amendment claims brought under § 1983. Nevertheless, Congress provided that RLUIPA "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g). In enacting RLUIPA, Congress imposed a *substantive* obligation upon prison officials extending well beyond that imposed by the First Amendment; a "least restrictive alternative" test was decisively rejected by the Supreme Court in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), but in RLUIPA, Congress has adopted precisely such a standard. In light of Congress's stated preference for a broad construction, this court is unwilling to assume that Congress intended to incorporate into RLUIPA the judge-made limits of potential liability under § 1983 if other principles of tort law casting a broader net might result in "appropriate relief."

In this case, the court concludes that Briley's deliberate avoidance of any involvement in review of Plaintiff's grievance establishes sufficient "fault," an adequate causal nexus to Plaintiff's injury, to support a finding of liability against him. Before the Supreme Court held in *Daniels v. Williams*, 474 U.S. 327 (1986), and *Davidson v. Cannon*, 474 U.S. 344 (1986), partially overruling *Parratt v. Taylor,* 451 U.S. 527 (1981), that merely negligent acts could not "deprive" a person of life, liberty or property within the meaning of the Due Process Clause, negligent supervision could render a supervisor liable for a subordinate's constitutional torts. *See, e.g., McKinnon v. City of Berwyn*, 750 F.2d 1383, 1391 (7th Cir. 1984). Proof of a supervisor's intentional avoidance of knowledge of a subordinate's actions may not prove that the supervisor was reckless in the criminal sense required under § 1983 unless the supervisor had some inkling of the subordinate's wrongdoing. Briley's conduct here, however, where he permitted a subordinate to make a decision in Briley's own name, while ensuring that he would never review that decision, constitutes negligent supervision.

It is true, of course, that a warden cannot be expected to review subordinates' decisions based on professional expertise the warden does not share, for example, decisions concerning

22

medical treatment. Here, however, Peterson's implementation of Rule 425.70 required no particularly professional expertise. Briley would have been equally able to evaluate whether requiring written verification from a clergy member substantially burdened Plaintiff's religious practice. And as warden, Briley was in a *better* position than Peterson to evaluate whether requiring written verification was the least restrictive means of addressing any administrative issues that might be raised.

## CONCLUSION

The court accordingly grants Plaintiff's motion for summary judgment (Doc. No. 40-1) as to the liability of both Peterson and Briley under RLUIPA. Several issues remain including (a) the question of whether RLUIPA authorizes an award of damages against individual Defendants in this case, or whether the "appropriate relief" available here is limited to an injunction; (b) if an award of damages is available, whether Plaintiff is entitled to such an award in this case; and (c) the appropriate disposition of Plaintiff's personal property claims. The court will convene a telephone status conference to discuss these issues at 8:30 a.m. on Tuesday, September 7, 2004, and directs Defendants' counsel to make arrangements for Plaintiff to participate in such a call.

ENTER:

Dated: August 24, 2004

REBECCA R. PALLMEYER
United States District Judge